* * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. All parties are properly brought before the Industrial Commission and are subject to and bound by the provisions of the Workers' Compensation Act. The Commission has *Page 2 
jurisdiction over the parties and the subject matter, and an employer-employee relationship existed between plaintiff and defendant-employer.
2. All parties have been correctly designated and there are no questions as to misjoinder or nonjoinder of the parties.
3. All carriers have been correctly designated, and The Hartford is properly on the risk. There are no questions as to insurance coverage of the parties.
4. Plaintiff's average weekly wage is $ 540.33, which yields a compensation rate of $ 360.24.
5. Plaintiff suffered compensable injuries by accident in the course and scope of his employment, as specified in the stipulated medical records, on December 2, 2002 and received indemnity compensation from December 3, 2002 through March 24, 2003 and medical compensation.
6. In addition, on September 28, 2005, the Deputy Commissioner issued a Consent Order, wherein the parties agreed that defendants would pay plaintiff temporary total disability compensation for the period from May 14, 2004 through and including August 26, 2004 in a lump sum, plus an additional ten percent of that sum, subject to any attorney's fee requested by plaintiff's counsel and approved by the Commission.
 Exhibits
The following documents were admitted into evidence at the hearing before the Deputy Commissioner as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Packet of documents including plaintiff's medical records and Industrial Commission Forms *Page 3 
 • Exhibit 3: Letter dated April 2, 2003 from defendant-employer to Willie R. Perry, Jr.
 • The following document was accepted into evidence as defendants' exhibit:
 Exhibit 1: Personnel records concerning plaintiff's March 27, 2003 termination
Transcripts of depositions of the following were also received post-hearing:
 • Dr. Vani R. Chilukuri (with Stipulated Exhibit 1, additional medical records)
 • Patrick E. Logue, Ph.D.
 • Miriam H. Feliu, Ph.D. (with plaintiff's Exhibit 1 and defendants' Exhibit 1)
 Issues for Determination
The issues for determination include:
 (1) Whether plaintiff is entitled to further medical treatment as recommended by Dr. Logue?
 (2) Whether defendants offered plaintiff suitable employment after his injuries?
 (3) If defendants offered plaintiff suitable employment, whether defendants have met their burden to show that plaintiff was terminated for misconduct, that the misconduct would have resulted in the termination of a nondisabled employee, and that the termination was unrelated to plaintiff's compensable injury? *Page 4 
 (4) If defendants have met their burden, whether plaintiff has shown that his inability to find or hold other employment at a wage comparable to that he earned prior to his injury is due to his work-related disability? and
 (5) Whether plaintiff is entitled to additional indemnity and/or medical compensation, and, if so, to what compensation is he entitled?
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 45 years old. He was born and raised in Mexico and has resided in the United States for approximately seven years. His wife and three minor children still reside in Mexico. He completed the eighth grade in Mexico and his work history has been primarily in construction. He speaks very limited English, as his native language is Spanish. At the hearing before the Deputy Commissioner, plaintiff testified through an interpreter. Plaintiff is right hand dominant.
2. On December 2, 2002, while working with defendant-employer as a sheetrock finisher, plaintiff fell about 10 or 15 feet from a scaffold, landing on his right side. As a result of the fall, he lost consciousness.
3. Based on his testimony at the hearing before the Deputy Commissioner, the last thing plaintiff remembers about his fall was that the scaffold was loose and he thought he might fix it. He remembers waking up in Duke University Medical Center.
4. On the date of the fall, plaintiff was diagnosed at the hospital's emergency room with multiple facial fractures, traumatic perforation of the right tympanic membrane and a right *Page 5 
radial fracture. There was a question as to whether plaintiff had suffered a head injury because of his loss of consciousness.
5. Defendants accepted this claim as compensable with the filing of a Form 63 Notice to Employee of Payment of Compensation Without Prejudice that was dated December 19, 2002. The filing did not specify the nature of the injuries that defendants were accepting as compensable. Since filing the Form 63, defendants have not filed a Form 61 Denial of Claim.
6. On December 20, 2002, plaintiff underwent surgery at Duke University Hospital with Dr. Thomas Hung, an otolaryngologist to repair his right zygomatic arch fracture. On January 22, 2003, Dr. Hung opined that plaintiff should perform light duty work for two weeks and then return to full duty, pending the activity restrictions related to his right wrist fracture.
7. On March 20, 2003, Dr. Diane M. Allen, an orthopedic surgeon, to whom plaintiff had presented for his right wrist fracture, opined that plaintiff could return to work as long as he wore his splint at all times and did not lift more than 25 to 50 pounds with his right arm "at the very most occasionally."
8. After presenting defendant-employer with Dr. Allen's March 20, 2003 recommendation, defendant-employer asked plaintiff to return to work, which plaintiff did on March 26, 2003. Plaintiff worked all day on March 26, 2003, apparently without incident.
9. On March 27, 2003, defendant-employer assigned plaintiff to fire-taping walls, which entailed the use of red mud. A bag of red mud weighs between 20 and 50 pounds. According to plaintiff's testimony at the hearing before the Deputy Commissioner, during the course of the day, Mr. Eason told plaintiff to take off his right wrist brace because plaintiff was experiencing difficulty completing his work due to the limitation of movement caused by the brace. *Page 6 
10. In the morning, plaintiff brought a friend with him on the work van. When they arrived at the job site, plaintiff's friend asked plaintiff's supervisor, Simpson Eason, for a job. Bringing the friend onto the job site was against company policy.
11. Mr. Eason testified at the hearing before the Deputy Commissioner that he also found plaintiff in an area of the job site in which he was not supposed to be and warned plaintiff about this violation. Finally, Mr. Eason saw plaintiff returning to the job site from across the street well after lunch break was over. According to Mr. Eason's testimony, when he confronted plaintiff about being off the job site during working hours, plaintiff had a "defiant attitude." Upon this last occurrence, Mr. Eason terminated plaintiff from his employment with defendant-employer.
12. Mr. Eason had the right, as the job foreman, to terminate employees for any number of grounds, including unauthorized absences, failure to produce work, not following directions and insubordination.
13. On May 22, 2003, Dr. Allen noted that plaintiff was having continued trouble with his right wrist. X-rays taken that day showed a non-united scaphoid fracture with evidence of avascular necrosis and a scapholunate injury with carpal instability.
14. On June 9, 2003, plaintiff presented to Dr. Vani R. Chilukuri, a board certified neurologist, with problems related to continued severe headaches. Many of her consultations with plaintiff were conducted through an interpreter and, as Dr. Chilukuri testified, this complicated her evaluation of plaintiff because she could not discern the nuances of what plaintiff was relating.
15. As Dr. Chilukuri testified, plaintiff presented with symptoms of a closed head injury. Dr. Chilukuri, noting the difficulty presented by the language barrier, diagnosed plaintiff *Page 7 
with chronic daily headaches, most likely post-traumatic in nature. She also noted that plaintiff had new sensory loss on his left side in his face, arm and leg. Based on this finding, Dr. Chilukuri ordered a brain MRI.
16. On July 8, 2003, plaintiff underwent the brain MRI, which produced no specific findings. As Dr. Chilukuri testified, it is possible for a patient suffering from post-traumatic headaches to have a normal brain MRI and this MRI did not rule out or confirm any diagnosis.
17. With Dr. Chilukuri, plaintiff has followed a course of medications, first Neurontin, then Nortriptyline, which have helped with his headaches. However, plaintiff still gets severe headaches about twice a week.
18. On May 14, 2004, Dr. Allen performed a scaphoid excision procedure with a four-corner fusion on plaintiff's right wrist. Dr. Allen's post-operative diagnosis was right wrist post-traumatic arthrosis.
19. On July 22, 2004, Dr. Allen noted that plaintiff had been doing some painting and other work and that plaintiff told her he was doing much better with his wrist since the surgery. Dr. Allen thought that plaintiff might be doing too much with the wrist, and she recommended work hardening.
20. On August 26, 2004, Dr. Allen determined plaintiff to be at maximum medical improvement for his right wrist condition, although he still had some ulnar pain. Dr. Allen released plaintiff to unrestricted activities with a 25% permanent partial impairment to his right wrist.
21. On February 4 and 11, 2005, plaintiff underwent a comprehensive neuropsychological assessment with Drs. Logue and Feliu in order to evaluate his neurocognitive functioning. Dr. Logue is a board certified clinical neuropsychologist and Dr. Feliu is a licensed *Page 8 
psychologist with post-doctoral training at Duke University in neuropsychology and chronic pain. Dr. Feliu is fully bilingual in English and Spanish. Because Dr.Feliu's native tongue is Spanish, Dr. Logue enlisted her help in evaluating plaintiff. Dr. Feliu evaluated plaintiff using testing that was written and administered in Spanish. Drs. Logue and Feliu evaluated plaintiff over two separate days, one week apart, totaling 10-12 hours. Dr. Logue reviewed plaintiff's other medical records before reaching his conclusions.
22. Based on the evaluation with Drs. Logue and Feliu, plaintiff's intellectual functioning level was found to be below what the evaluators expected, given plaintiff's educational level and pre-injury vocational aptitude. Plaintiff also showed symptoms of anxiety and depression. Drs. Logue and Feliu diagnosed plaintiff with a closed head injury with attendant depression, poor impulse control, irritability, anxiety and cognitive deficits.
23. Based on their findings, Drs. Logue and Feliu recommended the following for plaintiff: (1) a course of vocational rehabilitation including cognitive retraining; (2) referral to a neuropsychiatrist for evaluation and management; (3) continued treatment with Dr. Chilukuri for plaintiff's post-traumatic headaches; (4) referral to a pain management program; (5) referral to a social worker or case manager; and (6) a neuropsychological follow-up in one year.
24. As Dr. Feliu testified, plaintiff presented a valid profile on the MMPI-II, and his profile was consistent with someone who is in chronic pain. As she further testified, she believes, based on the testing results, that plaintiff's frontal brain lobes were affected in the December 2, 2002 fall.
25. Based on Dr. Logue's report and testimony, he has opined that (1) plaintiff's December 2, 2002 fall was severe enough to have produced a traumatic brain injury; (2) given that plaintiff suffered a loss of consciousness, he sustained a traumatic brain injury, which *Page 9 
changes the brain's functioning; (3) plaintiff suffered at least a mild brain injury, which would not necessarily show up on an MRI; (4) Plaintiff's depression and anxiety did not pre-dated his head injury; (5) upon testing, plaintiff was well-motivated but performed at the lowest percentile on the digit symbol test, which is the test that is most sensitive to central nervous system effects; (6) plaintiff is well-impaired in his frontal lobe executive functions, particularly in stressful situations; and (7) plaintiff's ability to solve problems within a complex motor activity is very low and is much worse than what he would expect from a construction worker.
26. As Dr. Logue opined and the Full Commission finds, based on plaintiff's history, the severity of his injury and the pattern of the test scores, which are consistent with the typical results for patients with closed-head injuries, plaintiff's neurocognitive changes were caused by plaintiff's December 2, 2002 fall and were exacerbated by his depression and anxiety. Plaintiff's current level of depression and anxiety is related to plaintiff's physical, emotional and neuropsychological changes following his fall at work.
27. Dr. Logue testified that as of the time of his deposition on November 10, 2005, from a neuropsychological standpoint, plaintiff was unable to work. Dr. Logue further opined that plaintiff would not have been able to maintain a sustained job from the time of plaintiff's injury to his evaluation. However, Dr. Logue opined that at some point in the future, plaintiff might be able to return to work if he received appropriate treatment.
28. Regarding plaintiff's chronic severe headaches, Dr. Chilukuri stated that, as of the last time she saw him on December 8, 2005, plaintiff was not capable of working, as she would find it difficult to imagine plaintiff holding any steady employment with two severe headaches per week as plaintiff stated he had.
 29. The Full Commission finds plaintiff to be a credible witness. *Page 10 
30. Dr. Chilukuri only conducted mental status testing on plaintiff once, at the initial consultation, and it took approximately ten minutes. Regarding why plaintiff never mentioned any cognitive-type issues to her, Dr. Chilukuri inferred, based on her experience, that plaintiff may not have told her about these problems because he viewed her solely as his physician for the treatment of his physical pain.
31. Dr. Chilukuri noted that she does not have any neuropsychological training and deferred to Drs. Logue and Feliu for their diagnoses related to plaintiff's cognitive difficulties.
32. The greater weight of the medical evidence reveals that from a neuropsychological point of view, plaintiff cannot work because he could not hold a job with his combination of significant cognitive problems, sleep disturbances, depression, anxiety, physical limitations and pain.
33. In addition to the medical evidence that reveals plaintiff has been unable to work due to his neurocognitive problems and chronic headaches, plaintiff's low level of education, wrist impairment, lack of skills outside of welding and construction and his inability to speak English are all factors that contribute to plaintiff's total loss of wage earning capacity.
34. At the hearing before the Deputy Commissioner, plaintiff testified that he attempted to return to work with another employer in Charlotte after being terminated by defendant-employer but was only able to work for three eight-hour days at the rate of $ 11.50 per hour. Plaintiff further testified that this employer terminated him because he worked too slowly. According to plaintiff, this was due to the pain he was experiencing and his limited range of motion in his wrist. Plaintiff did not attempt further employment.
35. The greater weight of the medical evidence reveals and the Full Commission so finds that as a consequence of plaintiff's injuries sustained as a result of the December 2, 2002 *Page 11 
fall, he has been physically and/or mentally incapable of work in any employment since that time.
36. As of the date of the hearing before the Deputy Commissioner, plaintiff was still having problems with his right wrist and could not hear well in his right ear. His jaw was popping on his right side, and he still had chronic headaches.
37. The Full Commission finds that plaintiff's neurocognitive difficulties were caused by his December 2, 2002 fall, and the treatment that Dr. Logue has recommended is related to plaintiff's neurocognitive difficulties and is reasonably required to effect a cure, give relief and to lessen the period of plaintiff's disability.
38. The Full Commission finds Dr. Chilukuri's treatment of plaintiff to this point, including but not limited to the medications she has prescribed has been reasonably required to effect a cure, provide relief and lessen the period of plaintiff's disability.
39. After reviewing the case, Karen Smith, Director of the Industrial Commission's Nurses' Section, recommended in a report dated August 17, 2005, that the parties proceed with Dr. Logue's recommendations.
40. The Full Commission finds further treatment with Dr. Chilukuri, and additional treatment according to Dr. Logue's recommendations, is reasonably required to effect a cure, provide relief and/or lessen the period of plaintiff's disability.
41. Defendants have not defended this matter without reasonable grounds.
 * * * * * * * * * * *
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following: *Page 12 
 CONCLUSIONS OF LAW
1. On December 2, 2002, plaintiff sustained compensable injuries by accident arising out of and in the course and scope of his employment with defendant-employer when he fell from a scaffold landing on his right side and losing consciousness. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximal result of his compensable injuries, plaintiff developed neurocognitive changes, anxiety and depression. N.C. Gen. Stat. § 97-2(6).
3. As a consequence of his compensable injuries on December 2, 2002 and resulting medical conditions of neurocognitive deficiencies, anxiety and depression, plaintiff is entitled to temporary total disability compensation at the rate of $ 360.24 per week for the period from December 2, 2002 through March 25, 2002 and from March 28, 2002 continuing until further Order of the Commission, excluding the three days he worked for another employer for which he is entitled to receive partial disability benefits under N.C. Gen. Stat. § 97-30. N.C. Gen. Stat. § 97-29.
4. As a consequence of his compensable injuries on December 2, 2002 and resulting medical conditions of neurocognitive deficiencies, anxiety and depression, plaintiff is entitled to have defendants pay him partial disability benefits at a weekly compensation rate of two-thirds the difference between his pre-injury average weekly wage and the average weekly wage that he earned for the three days that he attempted to return to work for another employer after being terminated by defendant-employer. N.C. Gen. Stat. § 97-30.
5. As a consequence of his compensable injuries on December 2, 2002, plaintiff retains a twenty-five percent (25%) permanent partial disability to his right hand, entitling him to 50 weeks of compensation at the rate of $ 360.24 for his permanent partial disability. N.C. Gen. Stat. § 97-31. N.C. Gen. Stat. § 97-31 is in lieu of other compensation.Whitley v. Columbia *Page 13 Lumber Manufacturing Co., 318 N.C. 89, 348 S.E.2d 336 (1986). N.C. Gen. Stat. § 97-31 furnishes a list of specific injuries and corresponding compensations while N.C. Gen. Stat. § 97-29 provides compensation for total disability. Dishmond v. International PaperCompany, 132 N.C. App. 576, 512 S.E.2d 771 (1999). This statutory scheme exists to prevent double recovery, not to dictate an exclusive remedy. Therefore, plaintiff is obligated to elect to proceed under N.C. Gen. Stat. § 97-29 or N.C. Gen. Stat. § 97-31, as he is not eligible to receive both. Gupton v. Builders Transport, 320 N.C. 38, 357 S.E.2d 674
(1987).
6. As a consequence of his compensable injuries and resulting medical conditions of neurocognitive deficiencies, anxiety and depression, plaintiff is entitled to have defendants provide all treatment necessitated by his December 2, 2002 injury and resulting conditions, including but not limited to the evaluation by Drs. Logue and Feliu on February 4 and 11, 2005 and full reimbursement of any amounts that plaintiff or any third party payor has paid out-of-pocket for prescription medications related to his compensable injuries for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-19; 97-25.
7. Defendants did not unreasonably defend or prosecute this matter; therefore, plaintiff is not entitled to an award of attorneys' fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 A W A R D
1. Subject to the attorney's fee hereinafter approved, defendant shall pay temporary total disability compensation to plaintiff at a rate of $ 360.24 per week for the period from *Page 14 
December 2, 2002 through March 25, 2002 and from March 28, 2002 continuing until further Order of the Commission, excluding the three days for which he is entitled to receive temporary partial disability benefits as awarded below. Compensation that has accrued shall be paid in a lump sum, also subject to the attorney's fee.
2. Subject to the attorney's fee hereinafter approved, plaintiff is entitled to receive partial disability benefits at a weekly compensation rate of two-thirds the difference between his pre-injury average weekly wage and the average weekly wage that he earned for the three days that he attempted to return to work for another employer after being terminated by defendant-employer.
3. Subject to the attorney's fee hereinafter approved, plaintiff is entitled to receive compensation for a twenty-five percent (25%) permanent partial disability rating to his hand. Compensation that has accrued shall be paid in a lump sum, also subject to the attorney's fee.
4. Plaintiff is entitled to elect the more munificent remedy between his benefits for total disability under N.C. Gen. Stat. § 97-29 and disability benefits under N.C. Gen. Stat. § 97-31.
5. As a consequence of his compensable injuries and resulting neurocognitive deficiencies, anxiety and depression, plaintiff is entitled to have defendants provide for all treatment necessitated by his December 2, 2002 injury and resulting conditions, including but not limited to the evaluation by Drs. Logue and Feliu on February 4 and 11, 2005 and full reimbursement of any amounts that plaintiff or any third party payor has paid out-of-pocket for prescription medications related to his compensable injuries for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. *Page 15 
6. Drs. Logue and Feliu are designated as plaintiff's treating physicians for plaintiff's neurocognitive conditions, and defendants shall authorize and pay for the treatment and referrals that Drs. Logue and Feliu recommend for plaintiff's neurocognitive conditions, including but not limited to the recommendations set out in their February 11, 2005 report. Dr. Chilukuri is authorized as plaintiff's treating physician for his neurological symptoms related to his compensable injuries, including but not limited to his headaches.
7. A reasonable attorney's fee of twenty-five percent (25%) of the lump sum compensation awarded plaintiff in Paragraphs 1, 2 and 3 of this Award is approved for plaintiff's counsel and shall be deducted from those amounts and payable directly to plaintiff's counsel. Any compensation that has accrued shall be paid in a lump sum, subject to the attorney's fee. Thereafter, every fourth compensation check shall be payable directly to plaintiff's counsel.
Defendants shall pay the costs.
This the ___ day of April 2007.
 S/______________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_________________ *Page 16 
DIANNE C. SELLERS COMMISSIONER *Page 1